UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO K. SAYLES,

        Plaintiff,        CIVIL ACTION NO. 12-cv-12139

vs.

                          DISTRICT JUDGE JOHN CORBETT O'MEARA

COMMISSIONER OF        MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Antonio Sayles seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security for his physical impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 17) and Defendant's Motion for Summary Judgment (docket no. 20). The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 2.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

**I.    RECOMMENDATION:**

This Court recommends that Plaintiff's Motion for Summary Judgment (docket no. 17) be DENIED and that Defendant's Motion for Summary Judgment (docket no. 20) be GRANTED.

**II.    PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Social Security Income with protective filing dates of September 10, 2009, alleging

that he had been disabled since May 2, 2004, due to various physical impairments. (*See* TR 20.) Plaintiff later amended his alleged onset date to June 29, 2006.[1] (*See* TR 41.) The Social Security Administration denied benefits. (*See* TR 20.) Plaintiff requested a *de novo* hearing, which was held on January 28, 2011,[2] before Administrative Law Judge (ALJ) John R. Rabaut, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the national economy. (TR 20-31.) The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced the instant action for judicial review. The parties then filed their Motions for Summary Judgment.

### III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

#### A. Plaintiff's Testimony

Plaintiff was 40 years old at the time of the administrative hearing and 36 years old at the time of alleged onset. (TR 40-41.) Plaintiff has past work experience as a stock person, a telemarketer, a hospital transporter, and a postal clerk. (TR 42.) Plaintiff testified that he hadn't worked anywhere since 2002 when he was fired from his job at the post office for excessive absenteeism.[3] (TR 43.) At the time of the hearing, Plaintiff had no source of income, and he lived with his wife and her two children (a 13-year-old girl and an 8-year-old boy) in a second-story

---

[1] Plaintiff filed a previous claim for disability benefits alleging the same May 2, 2004 onset date; his claim was denied by ALJ Ronald S. Robins on June 28, 2006. (*See* TR 20.)

[2] Plaintiff was represented by an attorney at his hearing, but he is not currently represented by counsel.

[3] Plaintiff indicated that following the attacks on September 11, 2001, the post office changed its policies due to concerns related to biological or chemical attacks. (TR 55.) Before that time, the post office had industrial fans running in the mail rooms that circulated the air, but to avoid spreading any contaminants, the fans were shut down. (TR 55.) Plaintiff testified that this caused the workplace to become more dusty, which caused his asthma to flare up. (TR 55.)

apartment. (TR 41-42.) Plaintiff had attended three years of college, working toward a bachelor's degree in psychology, but he was no longer attending school. (TR 42.)

Plaintiff testified that he missed work a lot because of underlying problems associated with asthma. (TR 43.) Later, he learned that he actually had atrial fibrillation and hypertension. (TR 54) He also developed vertigo, gout, and mechanical low-back pain. (*See* TR 23.) And underlying all of his conditions was his struggle with obesity; Plaintiff was 6' 2" tall and weighed 300 pounds at the time of the hearing, and he was gaining weight because he could not exercise due to his other conditions. (TR 48-49.) Plaintiff testified that while his troubles started in 2002, his condition had gotten worse since 2006. (TR 43.) He testified that he had dizzy spells, shortness of breath, and was passing out with more frequency. (TR 43.) He told the ALJ that he was able to control the dizziness by sitting down, but he suffered from shortness of breath on a daily basis. (TR 44.) Plaintiff testified that his back pain started sometime after 2006; that day, he could not get in bed and "[he] couldn't go up the stairs." (TR 45.) He was taken to the hospital and treated, but he was in a car accident a few moths later, which exacerbated his problem. (TR 46.) Plaintiff testified that the pain was right around his waist and that it shot down his legs. (TR 46.)

To alleviate his symptoms, Plaintiff took Lisinopril (for his blood pressure), Allopurinol (for his gout), Atenolol (to control his heart rate), Warfarin (for his atrial fibrillations), Vicodin (for his back pain), Lipitor (for his high cholesterol), and Xanax (to combat anxiety). (TR 45, 47.) Plaintiff indicated that these medications had helped control his blood pressure and his gout, but he did not indicate whether the other medications were effective. (TR 45.) He did, however, testify that the Lisinopril caused him to wheeze, and his inhaler gave him heart palpitations. (TR 48.) Plaintiff further testified that his doctors had advised him to elevate his legs throughout the day, that he may require surgery or cortisone injections for his back, and that he may need an ablation treatment for

his atrial fibrillation. (TR 53-54.) His doctors had also recommend that he avoid exposure to cleaning solvents or detergents, dust, pollutants, fumes, and pollen. (TR 53-54.) At the time of the hearing, Plaintiff had recently undergone a stress test and a sleep apnea test, but the results were not yet available. (TR 55-56.)

With regard to his daily activities, Plaintiff testified that he slept irregularly due to his conditions, but in the morning, he would take a shower, microwave his breakfast, and relax around the house. (TR 49.) He did not help his wife get the children ready for school because he couldn't, but he noted that the children were able to get themselves ready most days. (TR 49.) During the day, Plaintiff's wife would go to work, and he would stay home and watch television or lay down in the bedroom. (TR 50.) He acknowledged that he took care of his personal needs, like showering and shaving, but he did not have a driver's license, he did not do any chores around the house, he did not have any hobbies, he did not participate in any social activities, and he did not do any shopping. (TR 51-52.) Plaintiff testified that when everyone returned home in the evening, his wife would make dinner, the family would eat together, and then he would watch more television and "try[]to get some rest." (TR 52.)

### B.     Medical Record[4]

Because Plaintiff's previous claim was denied by ALJ Robins, ALJ Rabaut was required to accept Plaintiff's previous residual functional capacity as binding absent evidence of an

---

[4]Plaintiff's Motion does not address his medical history other than to make general claims about the severity of his various conditions, and Defendant's Motion merely cites to the ALJ's recitation of Plaintiff's medical history. Moreover, because Plaintiff does not raise any specific claims with regard to the ALJ's decision, the Court is limited to determining whether the ALJ's decision is supported by substantial evidence and is based on proper legal standards. Therefore, although the Court has reviewed Plaintiff's entire medical record, the Court will only briefly address Plaintiff's medical history in this Report and Recommendation to the extent that the ALJ addressed it in his final decision.

improvement or change in Plaintiff's condition since the prior hearing. (TR 20, citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) (additional citations omitted).) The ALJ found that Plaintiff's condition had deteriorated since his prior hearing (TR 20, 26); therefore, the ALJ divided his analysis of Plaintiff's medical conditions into pre- and post-hearing records. (*See* TR 25-29.) The Court will do the same.

### 1. 2002 through June 28, 2006

In August 2002, Plaintiff presented to Dr. Jeffrey Parker, his primary care physician, complaining of back pain. Dr. Parker recommended anti-inflammatory medication and instructed Plaintiff to lose weight. Dr. Parker also noted that Plaintiff's asthma was under control with medication. (*See* TR 25.)

In May 2003, Plaintiff was hospitalized for six days and was diagnosed with paroxysmal atrial flutter/atrial fibrillation and hypertension. Plaintiff was noted as having back pain and asthma, and the hospital performed an echocardiagram. Plaintiff was treated with blood thinners and other medication, and he began treating with a cardiac specialist, Dr. Souheil Saba. Dr. Saba noted that Plaintiff was obese but that his hypertension was well managed with medication. (*See* TR 25.) Plaintiff underwent unsuccessful shock cardioversion, but his atrial fibrillation was managed by beta blockers and anticoagulants through early 2006. (*See* TR 25-26.)

At two different office visits in 2003, Dr. Parker noted Plaintiff's diagnoses of atrial fibrillation, asthma, and obesity, but he also noted that Plaintiff had "poor patient compliance." Through seven office visits in 2004 and 2005, Dr. Parker added hypertension to Plaintiff's list of medical conditions. In March 2006, Plaintiff visited Dr. Saba. Plaintiff informed Dr. Saba that he was suffering dizziness on exertion, and Dr. Saba noted that Plaintiff had been noncompliant in taking his medications. Dr. Saba adjusted Plaintiff's medications, ordered an echocardiagram, a

stress test, and a 24-hour Holter monitor. Plaintiff was directed to make a follow-up appointment two weeks later. (*See* TR 26.) This appears to be Plaintiff's last appointment before his June 2006 hearing.

### 2.     June 29, 2006 through the Date of the ALJ's Decision

In November 2006, Plaintiff made and attended the follow-up appointment that Dr. Saba directed him to make in March 2006. Plaintiff had not seen Dr. Parker, had not undergone the ordered echocardiogram, and had not undergone the stress test.[5] Plaintiff indicated that he was still having problems with dizziness and increased heart rate. And on December 20, 2006, he underwent the echocardiogram and wore the Holter monitor as ordered, both of which showed favorable results and an ability to control his ventricular rate. Dr. Saba instructed Plaintiff that he needed to lose weight and change his lifestyle. (*See* TR 26.) In December 2007, Plaintiff saw Dr. Parker, who added gout to Plaintiff's list of diagnoses. Plaintiff saw Dr. Parker twice in 2008 and twice in early 2009. Dr. Parker noted that Plaintiff was still being treated for atrial fibrillation, asthma, obesity, hypertension, and gout. (*See* TR 26-27.)

On May 18, 2009, Plaintiff was transported to the hospital by ambulance after developing sudden, severe back pain. X-rays showed mild disc space narrowing at L5-S1, but he was released the same day with instructions to see Dr. Parker. Plaintiff saw Dr. Parker on June 23, 2009, after re-injuring his back in a motor-vehicle accident on June 12, 2009. Dr. Parker added lumbosacral sprain to Plaintiff's diagnoses and also noted mild degenerative arthritis of the lower lumbar spine. (*See* TR 27.)

On July 9, 2009, Plaintiff presented to the hospital with back pain and an irregular heartbeat,

---

[5]Plaintiff indicated that his failure to comply was due to insurance issues. (*See* TR 26.)

but he had no chest pain, shortness of breath, headache, loss of consciousness, dizziness, or visual changes. Plaintiff was prescribed pain medications and released the same day. Plaintiff presented to Dr. Parker on August 25, 2009, still complaining of lower-back pain. An MRI revealed a small disc herniation mildly effacing the ventral thecal sac, with mid degenerative changes. Throughout 2010, Dr. Parker saw Plaintiff and prescribed medications to treat cardiac-, asthma-, pain-, hypertension-, and anxiety-related issues. (*See* TR 27.)

On November 10, 2010, Plaintiff met with Dr. Salwon Anton, who evaluated his atrial fibrillation. Dr. Anton noted that Plaintiff's condition had been maintained for approximately eight years with rate control and anti-coagulant medications. Dr. Anton performed a stress test and an echocardiogram on Plaintiff and found that his atrial fibrillation was fairly well controlled, but he had a low fitness level and hypertension. Ultimately, Plaintiff was diagnosed with atrial fibrillation, hypertension, obesity, sleep apnea, asthma, and episodes of syncope and palpatations. (*See* TR 27-28.)

On December 16, 2009, Dr. Muhammad Mian provided an RFC assessment at the State's request. Dr. Mian opined that Plaintiff "could lift and carry 20 pounds occasionally and ten pounds frequently and that he could stand and/or walk for a total of about six hours and sit for a total of about six hours in an eight hour work day, with normal breaks." (TR 27.) Dr. Mien further opined that Plaintiff "could frequently climb ramps, stairs, ladders, ropes or scaffolds, balance, kneel crouch or crawl, but he could only occasionally stoop, and he had no environmental limitations."[6] (TR 27.)

On January 17, 2011, Plaintiff's attorney asked Drs. Parker and Anton to fill out evaluation

---

[6]The ALJ afforded little weight to Dr. Mian's assessment "because it fail[ed] to take into account the combined effect of [Plaintiff's] impairments" and because it was not consistent with Dr. Parker or Dr. Anton's assessments or the record as a whole. (TR 27.)

forms for Plaintiff. Dr. Parker opined that Plaintiff was unable to tolerate even "low stress" work, that he could not walk a city block, that he had no capacity to sit or stand, and that he could not carry any weight whatsoever. Dr. Parker recommended that Plaintiff avoid exposure to "extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals." (TR 28.) Dr. Parker noted that Plaintiff would required a sit/stand option and would need to elevate his legs 30 degrees for 30% of an eight-hour work day. Additionally, Dr. Parker opined that Plaintiff would be off task for 25% or more of an eight-hour work day. (*See* TR 28.) Dr. Anton reported similar findings, although he noted that Plaintiff could sit or stand for 20 minutes and 15 minutes respectively and that Plaintiff could lift 10 pounds or less on rare occasions.[6] (*See* TR 28.)

### C. The Vocational Expert

The ALJ asked the VE to consider an individual who could perform work at the light exertional level with no use of moving machinery, no working at heights, no climbing ladders, ropes or scaffolds, and with no exposure to poorly ventilated areas, environmental irritants, wetness and humidity, heat, or cold. (TR 59-60.) The VE Testified that such an individual could not perform Plaintiff's past relevant work. (TR 60.)

The ALJ then asked if someone with that RFC and Plaintiff's age, education, work experience, and skill set would be able to perform any other jobs in the national economy. (TR 60.) The VE testified that the individual could perform jobs, for example, as a file clerk, or a mailroom clerk. (TR 60-61.) The ALJ then asked the VE to assume the following:

---

[6]The ALJ gave some weight to the assessments of Drs. Parker and Anton. (TR 28-29.) He found that both doctors were overly sympathetic toward their patient but that their opinions were, at least to some degree, consistent with the record as a whole. (TR 28-29.)

> . . . an individual who can perform work at the sedentary exertional level, with no climbing ladders, ropes or scaffolds, only occasionally climbing ramps or stairs, occasional balance, stoop, crouch, kneel and crawl. No overhead reaching and handling, that's overhead. Avoiding concentrated exposure to extreme cold, heat, wetness and humidity[,] environmental irritants, poorly ventilated areas, avoiding all uses of moving machinery, avoiding all exposure to unprotected heights and work is going to be limited to a low stress job defined as having only occasional decision-making and only occasional changes in the work setting.

(TR 61.) The VE testified that such a person could work as a surveillance system monitor, a hand packer, or an information clerk. (TR 62.) When asked, the VE testified that the availability of positions would not change if a sit/stand option were added. (TR 62.) When asked if such an individual could maintain employment if he were also unable to engage in sustained work activity eight hours a day five days a week, the VE testified that such a limitation would preclude all employment. (TR 63.)

## IV.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through September 30, 2008; had not engaged in substantial gainful activity since June 29, 2006; and suffered from severe atrial fibrillation, vertigo, hypertension, obesity, gout, and mechanical low back pain; he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 22-24.) The ALJ found that Plaintiff's allegations regarding the extent of his symptoms were not totally credible, but he also found that Plaintiff's condition had deteriorated since his hearing before ALJ Robbins. (TR 25, 26.) The ALJ afforded "little weight" to the opinion of Dr. Mian, the State-examining physician, and "some weight" to the opinions of Drs. Parker and Anton, Plaintiff's treating physician and cardiologist. (TR 27, 28-29.) The ALJ then found that while Plaintiff could not perform his past work, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (TR 29-30.) Therefore, he was not suffering

from a disability under the Social Security Act at any time from June 29, 2006, through the date of the ALJ's decision. (TR 30-31.)

## V.  LAW AND ANALYSIS

### A.  Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**B.      Framework for Social Security Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     Plaintiff was not presently engaged in substantial gainful employment; and

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

**C.      Analysis**

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material

evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

    Plaintiff's argument reads, in total, as follows:

> Since I originally applied for benefits my medical condition has deteriorated significantly. All of the problems I suffer from have taken over my life. There are new medical issues that I have that also been (sic) added to my life. The Fibromyalgia pain is so unbearable that most days I cannot get out of bed. Depression is an ongoing battle that I deal with every day because of all my illnesses. The heart problems I suffer from make it impossible for me to work at any level. Every doctor that diagnosed me states these same facts. The Asthma makes it a grueling task to leave out the house (sic) because of all the exposures that constantly bring on attacks. Fainting and passing out has become an everyday routine, I don't believe there is any job that can accommodate all of these health conditions I suffer from. The only reason I seem to consistently be denied benefits is because of my age. These illnesses are not typical for a person my age to suffer from, but I am proof that sometimes a younger persons's health can deteriorate rapidly.

(Docket no. 17 at 2.) The Court is sympathetic to Plaintiff's struggles, but he has not alleged that the ALJ's opinion is unsupported by substantial evidence or that the ALJ failed to properly employ proper legal standards. He does not allege that the ALJ improperly weighed any of the evidence or opinions before him or that he improperly assessed Plaintiff's credibility. In short, while Plaintiff's argument is a heartfelt cry for help, it does not stand on any legal principle. Nevertheless, to the extent that Plaintiff intended to assert that the ALJ's opinion was not supported by substantial evidence in general, the Court will address that issue in light of Defendant's Motion.

### 1. The ALJ's Step 2 and Step 3 Findings

To the extent that Plaintiff challenges the ALJ's determination at Step 2 or Step 3, the Court finds that the ALJ's determination is supported by substantial evidence. The ALJ found that Plaintiff had severe atrial fibrillation, vertigo, hypertension, obesity, gout and mechanical low back pain. (TR 23.) Moreover, the ALJ noted that "[i]n this case, [Plaintiff's] obesity and hypertension contribute to and exacerbate his other impairments and their combined effects and I therefore find that they are severe." (TR 23.) As noted, Plaintiff has not articulated a specific argument, but the Court cannot find any alleged conditions that the ALJ did not include in his findings.[7]

The ALJ then considered whether Plaintiff's impairments met the requirements of Sections 4.00, 1.02, and 1.04 of the Listed Impairments, finding that his impairments did not meet these requirements. Again, Plaintiff has not raised any specific issues with regard to the ALJ's finding in this regard, and the Court cannot find any error in the ALJ's determination.

### 2. The ALJ's RFC Finding

In determining Plaintiff's RFC, the ALJ first considered Plaintiff's testimony. He discussed Plaintiff's allegations related to his conditions since 2006 and all of his claims related to hypertension, gout, heart problems, back pain, anxiety, and asthma. The ALJ considered Plaintiff's testimony with regard to his daily activities and his standard of living, and he then found that Plaintiff's testimony was not wholly credible with regard to the severity of his symptoms. (TR 25.)

---

[7]In his Motion, Plaintiff appears to assert that he also has fibromyalgia and depression, but Plaintiff did not present these diagnoses as part of his claim for benefits. In cases where, as here, the Appeals Council declines to review the ALJ's decision, judicial review is limited to the evidence that was part of the record before the ALJ. *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993); *Casey v. Secretary*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y*, 974 F.2d 680, 685 (6th Cir. 1993). Plaintiff did not raise these issues before the ALJ and does not attempt to provide new evidence; thus, the Court cannot consider these conditions as part of the instant Motions.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

14

In finding that Plaintiff's testimony was not wholly credible, the ALJ discussed the medical record as a whole. And as required, the ALJ considered Plaintiff's daily activities, Plaintiff's subjective claims of pain, the effectiveness of his various treatments, and his functional limitations. (TR 25-26.) The ALJ also noted several statements from Plaintiff's doctors indicating that he was not compliant with his treatment. (TR 26.) Thus, the ALJ's credibility determination is supported by substantial evidence and should be afforded appropriate deference.

The ALJ then dedicated nearly two pages of his opinion summarizing Plaintiff's medical record. (TR 25-27.) Plaintiff has not drawn the Court's attention to any evidence that was overlooked by the ALJ or that the ALJ allegedly considered improperly. To the contrary, the Court finds that the ALJ included a considerable amount of detail in his written opinion, and it appears that he carefully considered all of the evidence before him.

The ALJ then thoroughly discussed the RFC assessments provided by Drs. Mian, Parker, and Anton. The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a

finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Dr. Parker was Plaintiff's treating physician. Here, the ALJ addressed each opinion in turn and appears to have given controlling weight to Dr. Parker's opinion, although he did not adopt it in full. The ALJ indicated that he gave no weight to Dr. Mien's opinion, and "some weight" to the opinions of Drs. Parker and Anton, which reach similar conclusions. Moreover, the ALJ clearly set forth the specific parts of each opinion that he incorporated into Plaintiff's RFC and the specific parts of each opinion that he did not; he also explained why he afforded each section of each opinion a particular weight. In short, the ALJ's discussion of the weight that he afforded to each physician's opinion is a model of clarity.

As noted, the Court is sympathetic to Plaintiff's position, and because Plaintiff is not represented by counsel, the Court has afforded Plaintiff great deference in analyzing issues that Plaintiff has not specifically raised. Nevertheless, the Court finds that the ALJ's decision is well-reasoned, thorough, sufficiently specific to make clear the reasons for his various decisions, and supported by substantial evidence. Therefore, even if the Court disagreed with the ALJ, the Court would recommend denying Plaintiff's Motion and granting Defendant's Motion.

## VI.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 17) should be DENIED and Defendant's Motion for Summary Judgment (docket no. 20) should be GRANTED.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 2, 2013          s/ Mona K. Majzoub
                            MONA K. MAJZOUB
                            UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: May 2, 2013          s/ Lisa C. Bartlett

17


Case Manager